**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 26, 2018

**BY ECF**

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States v. Darcy Wedd,**
              **S3 15 Cr. 616 (KBF)**

Dear Judge Forrest:

        The Government respectfully submits this letter in advance of the sentencing of defendant Darcy Wedd ("Wedd," or the "defendant") and in response to the defendant's sentencing memorandum, dated March 19, 2018 ("Def. Mem."). As set forth in the Presentence Investigation Report ("PSR"), the applicable sentencing range pursuant to the United States Sentencing Guidelines (the "Guidelines") is 120 years' imprisonment on Counts One, Two, Four through Six, and Eight, to be followed by a mandatory two years' imprisonment on each of Counts Three and Seven. (PSR ¶ 145). The Probation Office recommends a below-Guidelines sentence of 180 months' imprisonment, while the defendant requests a sentence of 84 months' imprisonment. (PSR at 34; Def. Mem. at 39).

        As the Court knows, the defendant was at the epicenter of a massive fraud that stole money from millions of Americans. He was remorseless for this conduct during the time period of the conspiracy, and his lack of remorse extends to today. In his request for a below-Guidelines sentence, among other things, he seeks to minimize his own role in this fraud and also to minimize the harm that he perpetrated on the victims. The Government respectfully submits that the Court should reject these attempts to avoid responsibility, and instead impose a substantial sentence of imprisonment, at least in accordance with the recommendation of the Probation Office.

**A.**      **Background**

        **1.**      **The Offense Conduct**

        From 2011 through 2013, the defendant—while serving as a senior executive at Mobile Messenger—participated in a massive scheme to defraud millions of ordinary consumers by placing unauthorized charges for premium text messaging services on their cell phone bills through a practice known as auto-subscribing. (PSR ¶ 25). The scheme essentially involved two main players in the cell phone industry: aggregators and content providers. (PSR ¶ 28). Mobile Messenger, the company where the defendant served as Chief Operating Officer and later Chief

Executive Officer, was the aggregator that played a central role in the scheme. (*See* PSR ¶ 34). Mobile Messenger executives provided many of the phone numbers of the consumers who would be auto-subscribed and the mechanism that permitted the charges for those unwanted services to appear on the consumers' cell phone bills. (*See, e.g.,* PSR ¶¶ 25, 43, 53).

The content providers sent consumers the unwanted text messages that ultimately resulted in them being billed for services they had not authorized. (PSR ¶¶ 24-25). In the auto-subscribing scheme, Mobile Messenger worked with three sets of content providers, all of which were essential to the scheme's success: (1) Tatto Media ("Tatto"), which was operated by Lin Miao; (2) CF Enterprises and DigiMobi, which were operated by Eugeni Tsvetnenko, a/k/a "Zhenya," and (3) Bleam Technology, which was operated by Francis Assifuah. (PSR ¶¶ 36-38). The defendant was charged and convicted for his role in auto-subscribing with Tatto and with Zhenya.

### a. The Tatto Scheme

In or about 2011, Miao decided to begin auto-subscribing mobile phone users to Tatto's premium text messaging services in order to boost Tatto's sagging revenues. (PSR ¶ 39). Miao, with the assistance of others, built a computer program that could spoof the required consumer authorizations for premium text messaging services – *i.e.*, a program that could generate the text message correspondence that one would ordinarily see if a consumer were genuinely signing up to receive the services (the "Auto-Subscription Platform"). (*Id.*) The Auto-Subscription Platform was operational by in or about the middle of 2011. (*Id.*)

Beginning in August 2011, Wedd learned that Tatto was auto-subscribing consumers over another mobile aggregator, mBlox. (*See* PSR ¶ 41; *see also* GXs 185, 186, 187). In mid-September of 2011, Wedd ordered an audit of the Tatto short code that was running on Mobile Messenger's aggregation platform. (PSR ¶ 41). That audit revealed that Tatto was auto-subscribing on that short code, as well. (*See id.*; *see also* GX 279). Wedd told Tatto to "pause new subscriptions" on the short code while they "worked through" the issues. (PSR ¶ 41). Shortly thereafter, in October 2011, Miao met with Wedd in San Diego, California. (PSR ¶ 42). During this meeting, Miao told Wedd that Miao wanted to continue to auto-subscribe consumers through Mobile Messenger, and he needed Wedd's assistance to do so. (*See id.*) Wedd agreed to assist Miao. (*See id.*) Wedd further told Miao, in sum and substance, that co-conspirator Michael Pajaczkowski, who was the Vice President of Compliance and Consumer Protection at Mobile Messenger, would provide phone numbers and assistance to Miao and that all payments needed to go through Pajaczkowski. (*See id.*) Wedd later received his portion of the fraud proceeds from Miao via Pajaczkowski. (*See id.*)

The Tatto auto-subscribing scheme resulted in millions of mobile phone numbers being auto-subscribed through Mobile Messenger and other aggregators.

### b. The Zhenya Scheme

The plan to auto-subscribe with Zhenya came about in early 2012, in connection with discussions among the defendant, Pajaczkowski, Erdolo Eromo, and Fraser Thompson about how to increase revenue at Mobile Messenger, in the wake of the decreasing profitability of premium text messaging services. (PSR ¶ 51). By this time, the defendant and Pajaczkowski had already

been auto-subscribing with Miao through Tatto, and Eromo and Pajaczkowski were planning to auto-subscribe with Assifuah through Bleam Technology.  (*See* PSR ¶¶ 42-45, 63).  Zhenya operated several content provider companies and other mobile communications companies based in Australia.  (PSR ¶ 51).  Zhenya had been kicked off Mobile Messenger's aggregation platform in the past due to suspicious subscribing practices, including past incidents of auto-subscribing. (*See id.*).  As part of the plan orchestrated by the defendant, Eromo, Pajaczkowski, and Thompson, Zhenya established two new content providers, CF Enterprises and DigiMobi, to conduct an auto-subscribing scheme on Mobile Messenger's aggregation platform.  (*See* PSR ¶ 52).  The defendant, Eromo, Pajaczkowski, and Thompson agreed to a revenue split with Zhenya, pursuant to which Zhenya would keep approximately 70% of the auto-subscribing proceeds generated by CF Enterprises and DigiMobi, and the remaining 30% of the auto-subscribing proceeds would be divided evenly among the defendant, Eromo, Pajaczkowski, and Thompson.  (*Id.*).

The defendant, Eromo, Pajaczkowski, and Thompson each played important roles in the scheme to auto-subscribe with Zhenya.  Thompson and Eromo worked on the short code strategy for the scheme, to ensure that Zhenya was supplied with all the short codes he needed to be able to send the consumers the unwanted text messages.  (PSR ¶ 53).  Pajaczkowski furnished lists of phone numbers to Zhenya, along with an auto-subscribing "playbook," which provided Zhenya with guidance on how to auto-subscribe without being caught.  (*Id.*).  The defendant, to whom Eromo, Pajaczkowski, and Thompson all reported, oversaw the scheme.  (*Id.*).

The defendant, Eromo, Pajaczkowski, and Thompson devised a method of receiving and distributing the auto-subscribing money from Zhenya in a manner that would conceal the nature and purpose of the money.  (PSR ¶ 56).  Through the method they devised, Zhenya kicked back 30% of his auto-subscribing proceeds to a nominee company controlled by Eromo.  (*Id.*).  From there, Eromo distributed the 30% cut evenly amongst himself, the defendant, Pajaczkowski, and Thompson.  (*Id.*)  Eromo sent Wedd his portion of the money by funneling it to a nominee company that Wedd controlled – at first, through a nominee company controlled by Pajaczkowski, and later, to Wedd's nominee company directly.  (*See id.*)

Zhenya, with the assistance of the defendant, Eromo, Pajaczkowski, and Thompson, started auto-subscribing consumers in approximately April of 2012.  (*See* PSR ¶ 54).  Zhenya's auto-subscribing activities, which continued into 2013, resulted in hundreds of thousands of mobile phone numbers being auto-subscribed through Mobile Messenger.  (*Id.*).

### c.  Consumer Losses from the Schemes

In total, as a result of the Tatto auto-subscribing scheme, consumers were defrauded out of approximately $112 million.  (*See* GX 1401).  After the phone companies and mobile aggregators took their portions of the money, which amounted to approximately 35% for the phone companies and 15% of the mobile aggregators, respectively, Tatto received the remaining 50%, which amounted to approximately $56 million.  (*See id.*; *see also* Tr. 102).  The defendant, in turn received between 10% and 20% of the money that Tatto paid to Pajaczkowski in connection with the auto-subscribing scheme.  (Tr. at 217, 261).  Pajaczkowski received over $1.5 million from Tatto.  (*See* GX 1401).  Accordingly, the defendant personally received approximately several hundreds of thousands of dollars in Tatto auto-subscribing proceeds, in addition to a Rolex watch, which Tatto provided to him as a thank you for allowing them to continue auto-subscribing over

Mobile Messenger's platform. (*See, e.g.*, Tr. at 217, 783; *see also* GX 1410 (estimating that the defendant received approximately $190,468.49 in wire transfers of Tatto auto-subscribing money).

In total, as a result of the Zhenya auto-subscribing scheme, consumers were defrauded out of approximately $41,389,725. (PSR ¶ 74). After the phone companies and Mobile Messenger took their portions of that money, which amounted to approximately 35% for the phone companies and 15% for Mobile Messenger, respectively, Zhenya received the remaining 50%, which amounted to approximately $20,694,860.80. (*See id.*). From there, Zhenya distributed 30% of the $20,694,860.80 to the defendant, Eromo, Pajaczkowski, and Thompson, to be split evenly amongst the four of them. In total, then, the defendant personally received approximately $1,552,114.56 in Zhenya auto-subscribing proceeds (which is 30% of $20,694,860.80, divided by four).

The defendant's nominee companies, Phwoar LLC and Mojiva Media, received approximately $8,925,589 in proceeds, which was a combination of the $1,552,114.56 in Zhenya auto-subscribing money, a portion of the Tatto auto-subscribing money, and money due to the defendant for his participation in the separate content provider scheme. (*See* GX 1401).

## 2.    The Charges, the Verdict, and the Guidelines Calculation

On June 5, 2017, the defendant was charged in the above-referenced superseding Indictment with:  (1) participating in a conspiracy to commit wire fraud,  by auto-subscribing consumers through Tatto Media (the "Tatto auto-subscribing scheme"); (2) wire fraud in connection with the Tatto auto-subscribing scheme; (3) using the telephone numbers of consumers without authorization, as part of the Tatto auto-subscribing scheme: and (4) participating in a conspiracy to launder the money received from the Tatto auto-subscribing scheme.  The defendant was also charged with the same crimes in connection with auto-subscribing consumers through CF Enterprises and DigiMobi (the "Zhenya auto-subscribing scheme").  On December 15, 2017, a jury found the defendant guilty as charged.

The PSR correctly calculates the appropriate Guidelines Range under the United States Sentencing Guidelines, with one exception as noted in footnote 1 below.  For purposes of the Guidelines, pursuant to U.S.S.G. § 3D1.2(c) and (d), all of the counts except for the aggravated identity theft counts are grouped together ("Group 1").  (PSR ¶ 83).  Pursuant to U.S.S.G. §§ 3D1.3(b), 2S1.1(a)(1), and 2B1.1(a)(1), the base offense level is 7.  (PSR ¶ 85).  Because the loss from both the Tatto auto-subscribing scheme and the Zhenya auto-subscribing scheme was greater than $65 million but not greater than $150 million, the offense level is increased by 24 pursuant to U.S.S.G. § 2B1.1(b)(1)(M).  (PSR ¶ 86).  As the offense involved more than 10 victims, two levels are added pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(I).  (PSR ¶ 87).  Additional two-level enhancements in offense level are appropriate because the defendant used sophisticated means, including the use of a shell company to conceal his receipt of proceeds from the offense, *see* U.S.S.G. § 2B1.1(b)(10)(C), and because the defendant was convicted under 18 U.S.C. § 1956, *see* U.S.S.G. § 2S1.1(b)(2)(B).  (PSR ¶¶ 88-89).

In addition, two adjustments for the defendant's role in the offense are applicable.  First, the defendant was a leader or organizer of a criminal activity that involved five or more participants, and therefore a four-level increase is warranted pursuant to U.S.S.G. § 3B1.1(a). (PSR ¶ 92).  Second, as the defendant occupied a position of private trust, and used a special skill

to facilitate the commission and concealment of the offense, a two-level increase is warranted pursuant to U.S.S.G. § 3B1.3.  (PSR ¶ 91).

Finally, the defendant committed perjury when testifying at the trial that led to his conviction, as well as the two mistrials that proceeded it, by claiming he was not aware that his subordinates were engaged in auto-subscribing with Tatto and Zhenya, and that he himself did not participate in the auto-subscribing.  Accordingly, pursuant to U.S.S.G. § 3C1.1, a two-level increase is warranted.[1]

This leads to a total offense level of 45.  The defendant has no known prior criminal history, which places him in Criminal History Category I.  (PSR ¶¶ 100-01).  Accordingly, the defendant's Guidelines range would be life imprisonment, to be followed by a mandatory and consecutive 24 months' imprisonment on each of Counts Three and Seven, the aggravated identity theft charges, absent the application of the relevant statutory maximum terms of imprisonment.  As a result of those statutory maximum terms, the defendant's effective Guidelines range is 120 years, to be followed by a mandatory and consecutive 24 months' imprisonment on each of Counts Three and Seven, the aggravated identity theft charges.  (PSR ¶ 143).  The defendant should also be ordered to forfeit the auto-subscribing proceeds that he personally received from the scheme, which, as discussed above, amounted to at least approximately $1,742,583 (comprised of $1,552,114.56 in Zhenya auto-subscribing proceeds, plus $190,468.49 in wire transfers of Tatto auto-subscribing proceeds).

**B.    Discussion**

**1.    Applicable Law**

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid

---

[1] The Probation Department did not include this offense level increase in its Guidelines calculation, but instead deferred to the Court for determination of whether this Guideline is applicable.  (*See* PSR ¶ 93).  As further described below, the Government respectfully submits that this Guideline applies.

unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant; and
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

> **2.     A Substantial Sentence of Imprisonment, at Least in Accordance With the Recommendation of the Probation Department, Would Be Just and Appropriate**

A substantial sentence of incarceration, at least in accordance with the recommendation of the Probation Office, would be fair and appropriate in this case.  In particular, the nature and circumstances of the offense, the need for just punishment, and the need for general deterrence all justify such a sentence.

> a.     *Nature and Circumstances of the Offenses and the Defendant's Role*

The defendant played a pivotal role in a massive fraud that stole money from victims, $9.99 at a time.  The nature and circumstances of the offense are extraordinarily serious because of the massive impact that resulted to ordinary Americans.  Customers who entrusted their cellphone numbers to Mobile Messenger found themselves victimized because Wedd directed his subordinates to sell those customers' numbers to co-conspirators, and then permitted those co-conspirators to auto-subscribe the customers whose interests he was supposed to be protecting.

In total, millions of Americans across all demographic groups fell victim to this fraud— this was a true Main Street crime.  The defendant and his co-conspirators were indiscriminate in those that they victimized.  The defendant now suggests that, "[g]iven the relatively small amount of the loss suffered by individual consumers," he should receive leniency from the Court.  (Def. Mem. at 27).  This is a fatally flawed argument for two reasons.   First, while $9.99 per month might not be a lot of money for the defendant, for many of the defendant's victims it may have represented the difference between being able to keep their cellphone service turned on for a particular month and losing service.  For hourly workers, the stolen money might represent an hour or more of hard work.  Yet the defendant in his submission ignores the victims except to minimize the hardship that his fraud worked on them.  Second, this type of high-volume, low-dollar amount fraud is particularly dangerous to society because of the inherent difficulty in detecting and stopping it.  Victims of low-dollar frauds might be less inclined to spend the time and effort to report the wrongdoing, which can frustrate law enforcement's attempts to stop it, a fact that the defendant and his co-conspirators surely considered when designing this massive scheme.

The defendant's role in the scheme was pivotal. With respect to the Tatto auto-subscribing scheme, Miao testified that the defendant "was the only person that [Miao] could go to at that period of time" if he wanted to auto-subscribe with Mobile Messenger. (Trial Transcript ("Tr.") 756). Wedd was the one who permitted Tatto to begin auto-subscribing new consumers, and he was the one who came up with the idea to have Pajaczkowski work with Tatto to ensure that they would not get caught. Later, when it came time to auto-subscribe with Zhenya, the defendant occupied the same managerial role. He doled out responsibilities to his lieutenants – Pajaczkowski, Eromo, and Thompson – and received a cut of the proceeds in return. This fraud would not have succeeded had the defendant not given his permission and pledged the assistance of his organization to Tatto and Zhenya.

### b.    *Comparison to Co-Defendants*

To date, the Court has sentenced two defendants for their participation in the auto-subscribing conspiracy. Francis Assifuah, who operated a content provider that engaged in "active" auto-subscribing (*i.e.*, using telephone numbers initially to enroll cellphone users in a Premium SMS service) for one month, was sentenced to a term of imprisonment of 33 months, the bottom end of the Guidelines that were applicable to him. Assifuah was sentenced after conviction for wire fraud conspiracy; there was not a mandatory consecutive 24 months of imprisonment applicable for Assifuah. Fraser Thompson was sentenced to a term of imprisonment of 60 months, below his applicable Guidelines range. Thompson was involved only in the Zhenya auto-subscribing scheme, which accounted for one-quarter of the total loss amount to consumers.

By contrast to both of those defendants, Wedd was convicted of participating in both the Tatto auto-subscribing scheme and the Zhenya auto-subscribing scheme. As discussed above, he played the pivotal role in this scheme. But for his assent and assistance, auto-subscribing would not have taken place on the massive scale that Tatto and Zhenya conducted. Wedd, therefore, is far more culpable than either of the two defendants who have been sentenced thus far.

### c.    *Need for General Deterrence*

The need for general deterrence is critical in this case. As the defendant testified and defense counsel argued at trial, Wedd was synonymous with Mobile Messenger in the United States. He was Mobile Messenger's first employee in the United States, and built the company's operations here. He eventually rose to the senior-most position in the company. In short, the defendant molded Mobile Messenger's corporate culture – which, as demonstrated by the trial in this case, was corrupt to the core. The four most senior executives—the defendant, Thompson, Pajaczkowski, and Eromo, participated in a massive fraud using the instrumentalities of Mobile Messenger. Wedd's greed and willingness to break the rules taught his lieutenants that it was okay to do the same, and built an incubator for the massive auto-subscribing fraud that ultimately took place with Wedd's approval and participation.

A substantial sentence of imprisonment, in addition to having a deterrent effect on white collar criminals who might commit crimes to prop up their businesses (which was one of the defendant's motives in this case) and for personal enrichment (another motive), would send a message to those responsible for corporate culture and setting the tone at the top of organizations. Corporate leaders who are inclined to create cultures of corruption and fraud should think twice,

and a substantial sentence of incarceration here would have an important deterrent effect in that regard.

### 3.     Contested Guidelines Issues

The defendant takes issue with the application of various Guidelines enhancements, which are discussed below.

#### a.     *Loss Calculation*

The Probation Office calculates the loss from both the Tatto auto-subscribing scheme and the Zhenya auto-subscribing scheme as greater than $65 million but not greater than $150 million. The defendant contends that a lower loss amount is appropriate and argues (a) the loss amount includes the defendant's profits from the content provider scheme he engaged in with Thompson, Pajaczkowski, and Eromo; (b) it was not reasonably foreseeable to the defendant that Miao was auto-subscribing on other content providers in addition to Mobile Messenger; and (c) the Court should use actual loss, not intended loss. *See* Def. Mem. at 15-17.  Each of these arguments should be rejected.

First, the loss amount includes only auto-subscribing fraud, not earnings from the content provider scheme.  As discussed *supra* at pages 3 and 4, the total loss from the Tatto auto-subscribing scheme was approximately $112 million, and the total loss from the Zhenya auto-subscribing scheme was approximately $41 million.  The total of the two is approximately $153 million.  Using the loss range of $65 million to $150 million, therefore, is a conservative estimate.

Second, the defendant's contention that it was not reasonably foreseeable to him that Miao auto-subscribed on other mobile aggregators in addition to Mobile Messenger is easily discarded. Prior to the defendant meeting with Miao and permitting him to auto-subscribe at Mobile Messenger, Wedd was aware that Miao was auto-subscribing on different mobile aggregators. (*See, e.g.*, GX 185, 186, 187).  In fact, Wedd himself was auto-subscribed by Tatto on a different mobile aggregator.  (Tr. 1742).  Moreover, Wedd was paid a percentage of all of Tatto's auto-subscribing proceeds, including those received from mobile aggregators other than Mobile Messenger.  (Tr. 265) (testimony by Pajaczkowski that he paid Wedd a percentage of proceeds from auto-subscribing on mobile aggregators in addition to Mobile Messenger).  Wedd knew full well that Miao was auto-subscribing on mobile aggregators other than Mobile Messenger.  His contention now that he did not is but a continuation of his attempts to minimize his role and knowledge of the fraud.

Third, the defendant suggests that the Court measure loss by actual loss, not intended loss. However, the Guidelines are clear.  Subject to very limited exclusions that are inapplicable here, loss for purposes of U.S.S.G. § 2B1.1 is measured by "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 Application Note 3(A)(i).  Thus, there is no basis in the law for the Court to choose the lower loss amount for Guidelines purposes.  Even if there were, the actual billing to consumers was greater than $150 million – a fact that Wedd continues to refuse to accept.

b.      *Leadership*

The defendant suggests that he should not receive an adjustment in offense level for his leadership role because he was not necessary to the auto-subscribing scheme, others were involved before he was, and he was not the top earner in the scheme.  (*See* Def. Mem. at 15-18).  These arguments should be rejected for two reasons.

First, as the defendant himself points out in his sentencing submission, Eromo and Pajaczkowski both testified that Wedd played an oversight, managerial role with respect to the auto-subscribing schemes in which they participated.  (*See* Def. Mem. at 17-18 (citing Tr. 398, 1054-55)).  Such testimony alone would qualify the defendant for this adjustment in offense level. *See* U.S.S.G. § 3B1.1 Application Note 4 (in determining whether a defendant occupied a leadership or organizational role, courts should consider, among other things, "the exercise of decision making authority [and] the nature of participation in the commission of the offense").

Second, after Miao approached the defendant with a request for assistance in auto-subscribing, the defendant recruited Pajaczkowski to assist Miao and also to make sure that the auto-subscribing would not be detected.  (PSR ¶¶ 42-43).  Recruitment of accomplices, such as Pajaczkowski, is an additional factor that the Guidelines suggest courts should consider when determining whether to apply the leadership enhancement. *See* U.S.S.G. § 3B1.1 Application Note 4.

The trial record firmly supports the application of a leadership enhancement.  Wedd's arguments to the contrary should be rejected.

c.      *Abuse of Position of Trust or Use of a Special Skill*

The defendant argues that the enhancement pursuant to U.S.S.G. § 3B1.3 should not apply because no private trust was violated and he did not use a "special skill" within the meaning of the Guidelines.  *See* Def. Mem. at 18-19.

With respect to the argument that no trust was placed in Wedd by the victims of the offense, the facts of the instant case indicate otherwise.  Customers entrusted their cellphone numbers to Mobile Messenger as part of the process of signing up for premium text messaging services.  Wedd directed his subordinates to use those cellphone numbers to create lists that could be used by Miao and Zhenya to auto-subscribe those same customers. The fact that Wedd himself did not directly interact with customers, but instead sat on top of an organization that did, should not prevent application of this enhancement.  If that were the case, it would lead to the perverse result that more senior members of a conspiracy could insulate themselves from application of this Guideline by directing more junior level employees to interact with victims.

By virtue of his role as COO and then CEO at Mobile Messenger, Wedd had the freedom to commit a difficult-to-detect wrong out of the sight of victims and regulators.  *See, e.g.*, *United States v. Hill*, 915 F.2d 502, 506 (9th Cir. 1990) ("If one has placed a defendant in a position to commit a crime and leave the area before the crime will be discovered, the defendant will generally be in a position of trust.").  He also used the facilities of Mobile Messenger, and the expertise of his compliance department, to cover up what he and his co-conspirators had done.  Such conduct

merits the application of this Guidelines enhancement.  *See* U.S.S.G. § 3B1.3 Application Note 1 (noting that "the position of public . . . trust must have contributed in some significant way to facilitating the commission *or concealment* of the offense") (emphasis added).

               d.      *Obstruction of Justice*

        Finally, the defendant contends that the obstruction of justice enhancement should not apply.  *See* Def. Mem. at 19-22.  In the Second Circuit, even "a single instance of perjury is sufficient to trigger the obstruction of justice sentence enhancement" under U.S.S.G. § 3C1.1.  *United States v. Jenkins*, 687 F. App'x 71, 74 (2d Cir.), cert. denied, 138 S. Ct. 530, 199 L. Ed. 2d 406 (2017).  To qualify for the enhancement based on perjury, "a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997).

        The defendant committed perjury during the course of his testimony.  To take a few examples, (a) he testified that when Miao asked him in October 2011 whether Tatto could auto-subscribe at Mobile Messenger with Wedd's help, Wedd said no and then instructed Pajaczkowski to "keep a close eye on Tatto" after that, (Tr. 1599-1601); and (b) he did not know that CF Enterprises Pty Ltd. and DigiMobi Pty Ltd, Zhenya's entities, were engaged in auto-subscribing (Tr. 1649).  As the trial evidence and the jury verdict amply demonstrated, including testimony by Miao, Pajaczkowski, and Eromo, both of these statements were lies that went to the very heart of the case.

## CONCLUSION

        For the reasons set forth above, a substantial sentence of imprisonment, at least in accordance with the recommendation of the Probation Office, would be fair and appropriate in this case.

                         Respectfully submitted,

                         GEOFFREY S. BERMAN
                         United States Attorney

          By:       __/s/ Richard Cooper_____
                         Sarah E. Paul
                         Richard Cooper
                         Jennifer L. Beidel
                         Assistant United States Attorneys
                         (212) 637-2326/1027/2212

cc:      Maurice Sercarz, Esq. (by ECF)